UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


JAMES NEWSOME,

                Plaintiff,                                       Hon. Gordon J. Quist

v.                                                      Case No. 1:08-CV-532

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

_____/


## REPORT AND RECOMMENDATION

        This is an action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C.

§ 405(g), to review a final decision of the Commissioner of Social Security denying Plaintiff's claim

for Disability Insurance Benefits (DIB) under Title II of the Social Security Act.  Section 405(g)

limits the Court to a review of the administrative record, and provides that if the Commissioner's

decision is supported by substantial evidence, it shall be conclusive.  Pursuant to 28 U.S.C. §

636(b)(1)(B), authorizing United States Magistrate Judges to submit proposed findings of fact and

recommendations for disposition of social security appeals, the undersigned recommends that the

Commissioner's decision be **affirmed**.

        Also, before the Court is Defendant's Motion to Reconsider.  (Dkt. #17).  As

discussed herein, the undersigned recommends that Defendant's motion be **granted in part and**

**denied in part**.

## STANDARD OF REVIEW

The Court's jurisdiction is confined to a review of the Commissioner's decision and of the record made in the administrative hearing process. *See Willbanks v. Sec'y of Health and Human Services*, 847 F.2d 301, 303 (6th Cir. 1988). The scope of judicial review in a social security case is limited to determining whether the Commissioner applied the proper legal standards in making her decision and whether there exists in the record substantial evidence supporting that decision. *See Brainard v. Sec'y of Health and Human Services*, 889 F.2d 679, 681 (6th Cir. 1989).

The Court may not conduct a de novo review of the case, resolve evidentiary conflicts, or decide questions of credibility. *See Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984). It is the Commissioner who is charged with finding the facts relevant to an application for disability benefits, and her findings are conclusive provided they are supported by substantial evidence. *See* 42 U.S.C. § 405(g).

Substantial evidence is more than a scintilla, but less than a preponderance. *See Cohen v. Sec'y of Dep't of Health and Human Services*, 964 F.2d 524, 528 (6th Cir. 1992) (citations omitted). It is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Bogle v. Sullivan*, 998 F.2d 342, 347 (6th Cir. 1993). In determining the substantiality of the evidence, the Court must consider the evidence on the record as a whole and take into account whatever in the record fairly detracts from its weight. *See Richardson v. Sec'y of Health and Human Services*, 735 F.2d 962, 963 (6th Cir. 1984).

As has been widely recognized, the substantial evidence standard presupposes the existence of a zone within which the decision maker can properly rule either way, without judicial

interference.  *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (citation omitted).  This standard affords to the administrative decision maker considerable latitude, and indicates that a decision supported by substantial evidence will not be reversed simply because the evidence would have supported a contrary decision.  *See Bogle*, 998 F.2d at 347; *Mullen*, 800 F.2d at 545.


## PROCEDURAL POSTURE

Plaintiff was 47 years of age at the time of the ALJ's decision.  (Tr. 408).  He possesses a General Equivalency Diploma (GED) and worked previously as a laborer, assembler, and machine operator.  (Tr. 71, 83-89).

Plaintiff applied for benefits on April 17, 2000, alleging that he had been disabled since May 13, 1997, due to a back injury.  (Tr. 56-58, 103).  Plaintiff's application was denied, after which time he requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 27-52).  On April 5, 2002, Plaintiff appeared before ALJ William Decker.  (Tr. 367-93).  In a written decision dated May 24, 2002, the ALJ determined that Plaintiff was not disabled as defined by the Social Security Act.  (Tr. 18-26).  The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter.  (Tr. 5-8).

On October 24, 2002, Plaintiff initiated an action in the United States District Court for the Western District of Michigan, seeking judicial review of the ALJ's decision.  (Tr. 435-37).  The parties subsequently stipulated to reverse the Commissioner's decision and remand the matter, pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings.  (Tr. 449).  On April 20, 2004, Plaintiff appeared before ALJ Lawrence Blatnik, with testimony being offered by Plaintiff and vocational expert, Michelle Ross.  (Tr. 670-702).  In a written decision dated October 29, 2004, the

ALJ determined that Plaintiff was not disabled as defined by the Social Security Act. (Tr. 407-18). The Appeals Council declined to review the ALJ's determination, rendering it the Commissioner's final decision in the matter. (Tr. 394-96). Plaintiff subsequently initiated this appeal pursuant to 42 U.S.C. § 405(g), seeking judicial review of the Commissioner's decision.

## RELEVANT MEDICAL HISTORY

On April 9, 1997, Plaintiff injured his back while pushing a roll of steel. (Tr. 146, 148). On May 8, 1997, Plaintiff participated in an MRI examination of his lumbar spine, the results of which revealed "mild" degenerative changes, as well as "findings consistent with a focal left paramedian disc herniation with resultant compression involving the right L4 nerve root." (Tr. 147). Plaintiff's pain did not respond to conservative treatment and on June 26, 1997, Plaintiff underwent a L4-5 diskectomy and foraminotomy, performed by Dr. Naim Koymen. (Tr. 139-46, 150).

On September 12, 1997, Plaintiff participated in an MRI examination of his lumbar spine, the results of which revealed no evidence of disc herniation. (Tr. 172).

On October 13, 1997, Dr. Koymen reported that Plaintiff should return to "some light duty" work and "continue with his fitness and exercise." (Tr. 167). The doctor indicated that Plaintiff should be restricted to light duty work for three months, after which time he can "go back to full time work." (Tr. 167).

On December 17, 1997, Plaintiff participated in an electromyography examination of his lumbosacral spine and left lower extremity, the results of which revealed no evidence of radiculopathy. (Tr. 168).

Following a January 19, 1998 examination of Plaintiff, Dr. Koymen instructed Plaintiff to "become more functional and go back to work." (Tr. 166).

On April 5, 1998, Plaintiff was examined by Dr. Patricia Aronin. (Tr. 157-61). Plaintiff used a cane when he entered the examination room, but was able to "walk independently without the cane during the examination." (Tr. 160). Plaintiff exhibited "good" range of motion in his upper extremities and "full" range of motion in his lower extremities. (Tr. 160). Plaintiff "was able to forward flex bringing his fingertips to within 10 inches from the floor." (Tr. 161). Plaintiff was able to perform "lateral flexion and extension. . .without difficulty." (Tr. 161). The doctor concluded that Plaintiff could perform work activities subject to the following limitations: (1) he cannot lift more than 20 pounds, (2) he requires a sit/stand option, and (3) he can perform only limited twisting and bending. (Tr. 161).

On October 6, 1998, Plaintiff participated in an electromyography examination of his lumbosacral spine and left lower extremity, the results of which were "normal." (Tr. 178).

On April 12, 1999, Plaintiff participated in a consultive examination, conducted by Dr. Donald Paarlberg. (Tr. 195-98). Plaintiff reported that he was experiencing pain in his back and left leg. (Tr. 195). Plaintiff reported that he had been prescribed various medications to treat his pain, but that "he hasn't been taking them on a regular basis." (Tr. 195). Plaintiff reported that he can sit for 15 minutes, stand for 10 minutes, and "bend a little." (Tr. 195). Plaintiff also reported that he exercises, but experiences back pain if he does so "too often." (Tr. 195). Plaintiff exhibited "limited" range of motion in his lumbar spine. (Tr. 196). Straight leg raising was negative on the right, but positive on the left "at about 80 degrees." (Tr. 196). The doctor concluded that Plaintiff

could work subject to the following restrictions: (1) no prolonged sitting or standing; (2) he requires a sit-stand option; (3) no repetitive bending; (4) no lifting more than 10 pounds. (Tr. 196).

During a July 21, 1999 conversation with an official with the State of Michigan Disability Determination Service, Dr. Paarlberg reported that he "does not feel [Plaintiff] will be able to work any type of job full-time." (Tr. 193). The doctor also recommended, however, that Plaintiff participate in a functional capacity evaluation "to come up with the specifics on what he can and cannot do." (Tr. 193).

On August 19, 1999, Dr. Christina Daoud completed a report concerning Plaintiff's "tolerance for sustained ambulation." (Tr. 187). The doctor, who began treating Plaintiff in August 1998, reported that Plaintiff walked with a "normal appearing gait." (Tr. 187). Dr. Daoud reported that, if afforded a sit-stand option, Plaintiff could stand for four hours, stand/walk for two hours, and sit for six hours. (Tr. 187). The doctor also noted that Plaintiff's condition "has improved." (Tr. 187).

On November 1, 1999, Plaintiff received a lumbar epidural steroid injection. (Tr. 298). Plaintiff received another such injection on November 16, 1999. (Tr. 303). When he was examined on January 11, 2000, Plaintiff reported that this treatment relieved his pain. (Tr. 310). Plaintiff reported that he continued to experience pain "with standing, walking and sitting for long periods of time." (Tr. 310). On January 12, 2000, Plaintiff received a lumbar facet block injection. (Tr. 311).

During a May 9, 2000 examination, Plaintiff reported that he was presently "working @ truck area" and "has to walk sometimes > 2 miles at a time." (Tr. 282). Plaintiff reported that he "continuously has to be on his feet [with] very little time on average to rest." (Tr. 282). Plaintiff

reported that his work activity was causing "increased back pain" and that his medication was "no longer controlling [his] pain." (Tr. 282).

On May 11, 2000, Dr. Daoud authored a letter in which she reported that Plaintiff was capable of working, subject to the following limitations: (1) he can lift/carry up to 10 pounds; (2) he can stand/walk for two hours and sit for two hours; (3) he requires a sit/stand option; (4) he must be able to lie down approximately 3-5 times during a work shift; and (5) he can never twist, bend, stoop, crouch, or climb. (Tr. 280-81).

On September 14, 2000, Plaintiff participated in a consultive examination, conducted by Carol Lehmann, M.A. (Tr. 220-27). Plaintiff reported that he was "disabled by his back and left leg and depression." (Tr. 220). Plaintiff reported that he mows the lawn and "helps with laundry and dishes sometimes." (Tr. 223). Plaintiff reported that he also goes fishing, plays cards, watches television, and visits his mother. (Tr. 223). Plaintiff "walked slowly," but Lehmann also observed that Plaintiff's "seated posture was unremarkable." (Tr. 223). Plaintiff exhibited flat affect, but the results of a mental status examination were otherwise unremarkable. (Tr. 224-26). Lehmann diagnosed Plaintiff with (1) alcohol dependence, in remission; and (2) major depressive disorder, recurrent and mild with medication. (Tr. 226). Plaintiff's GAF score was rated as 50. (Tr. 226).

On October 16, 2000, Plaintiff participated in intelligence testing, the results of which revealed that Plaintiff possesses a verbal IQ of 78, a performance IQ of 78, and a full-scale IQ of 75, which Lehmann characterized as falling within the "borderline" range of intelligence. (Tr. 233).

On November 8, 2000, William Hampstead, Ph.D. completed a Psychiatric Review Technique form regarding Plaintiff's mental limitations. (Tr. 259-72). Determining that Plaintiff suffered from major depression, the doctor concluded that Plaintiff satisfied the Part A criteria for

Section 12.04 (Affective Disorders) of the Listing of Impairments. (Tr. 260-68). The doctor determined, however, that Plaintiff failed to satisfy any of the Part B criteria for this particular Listing. (Tr. 269). Specifically, the doctor concluded that Plaintiff experienced mild restrictions in the activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence or pace. (Tr. 269). The doctor concluded that there was "insufficient evidence" to determine whether Plaintiff experienced episodes of decompensation. (Tr. 269).

Dr. Hampstead also completed a Mental Residual Functional Capacity Assessment form regarding Plaintiff's limitations in 20 separate categories encompassing (1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation. (Tr. 273-76). Plaintiff's abilities were characterized as "moderately limited" in five categories. (Tr. 273-74). With respect to the remaining 15 categories, the doctor reported either that Plaintiff was "not significantly limited" or that there was "no evidence of limitation in this category." (Tr. 273-74).

On January 8, 2002, Plaintiff participated in an independent orthopedic evaluation, conducted by Dr. Earl Rhind. (Tr. 326-37). An examination of Plaintiff's lumbar spine revealed limited range of movement, but no evidence of muscular abnormality. (Tr. 330). Straight leg raising and Babinski testing were both negative. (Tr. 330). An examination of Plaintiff's lower extremities was "unremarkable." (Tr. 330). The doctor concluded that Plaintiff was unable to perform "any work involving heavy production," but that he could perform work "in an ergonomically neutral setting where he could alternatively sit or stand." (Tr. 336).

On August 6, 2002, Plaintiff was examined by Dr. Daoud. (Tr. 473). Plaintiff reported that he was experiencing "mild to moderate" back pain. (Tr. 473). Straight leg raising was

negative and Plaintiff exhibited "normal" sensation. (Tr. 473). Plaintiff walked with a "normal" gait and exhibited 5/5 muscle strength. (Tr. 473). The doctor observed that Plaintiff was "in no acute distress." (Tr. 473).

On September 16, 2002, Plaintiff was again examined by Carol Lehmann, M.A. (Tr. 475-81). Plaintiff reported that he visits his family doctor "every three months" and was "not always taking [his] medications according to directions." (Tr. 475). Plaintiff reported that he washes dishes, mows the lawn, watches television, and "tags along" when his wife goes shopping. (Tr. 477). Plaintiff reported that he experienced "no problems with driving up to 30 or 50 miles." (Tr. 478). Plaintiff walked with a "slow" gait, but Lehmann observed that Plaintiff carried his cane more than he actually used it. (Tr. 478). The results of a mental status examination were unremarkable. (Tr. 478-80). Plaintiff was diagnosed with (1) major depressive disorder, recurrent and mild; and (2) alcohol dependence, in remission. (Tr. 481). Plaintiff's GAF score was rated as 60. (Tr. 481).

On March 4, 2003, Plaintiff was examined by Dr. Richard Hartman. (Tr. 519). Plaintiff reported that he was experiencing discomfort in his right upper extremity. (Tr. 519). The examination revealed that Plaintiff was experiencing impingement syndrome and degenerative joint disease. (Tr. 519). Dr. Hartman prescribed medication, but Plaintiff indicated that he "does not have any interest in attempting" physical therapy. (Tr. 519).

Treatment notes dated May 1, 2003, indicate that Plaintiff's back pain had improved and that he was sleeping better. (Tr. 507). On June 3, 2003, Plaintiff rated his back pain as "mild to moderate." (Tr. 511). An examination of Plaintiff's spine revealed tenderness, but no spasm or muscle weakness. (Tr. 511). Dr. Daoud modified Plaintiff's medications. (Tr. 511). On July 7, 2003, Plaintiff reported that his back pain rated 5/10 "most of the time" and that "taking medications

helps without side effects." (Tr. 512). Dr. Daoud continued Plaintiff's medications and also instructed him to exercise. (Tr. 512). Treatment notes dated October 9, 2003, indicate that Plaintiff was ambulating without his cane. (Tr. 513). Plaintiff was again instructed to exercise. (Tr. 513).

On November 11, 2003, Plaintiff participated in a sleep study, the results of which revealed that he experienced "mild" sleep apnea. (Tr. 523). Plaintiff experienced an "excellent response" when using a CPAP machine. (Tr. 527).

At the administrative hearing, Plaintiff testified that he can walk 100 yards, stand for 15-30 minutes, sit for 30-40 minutes, and lift 10-20 pounds. (Tr. 679-80). Plaintiff reported that he experiences difficulty reaching overhead because of pain in his shoulders. (Tr. 682). Plaintiff reported that he prepares simple meals, washes his laundry, shops, sings karaoke, and goes fishing. (Tr. 689-90).

## ANALYSIS OF THE ALJ'S DECISION

### A. Applicable Standards

The social security regulations articulate a five-step sequential process for evaluating disability. *See* 20 C.F.R. §§ 404.1520(a-f), 416.920(a-f).[1] If the Commissioner can make a

---

[1] 1. An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. 404.1520(b));

2. An individual who does not have a "severe impairment" will not be found "disabled" (20 C.F.R. 404.1520(c));

3. If an individual is not working and is suffering from a severe impairment which meets the duration requirement and which "meets or equals" a listed impairment in Appendix 1 of Subpart P of Regulations No. 4, a finding of "disabled" will be made without consideration of vocational factors (20 C.F.R. 404.1520(d));

4. If an individual is capable of performing work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. 404.1520(e));

5. If an individual's impairment is so severe as to preclude the performance of past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if other work can

dispositive finding at any point in the review, no further finding is required.  *See* 20 C.F.R. §§ 404.1520(a), 416.920(a).  The regulations also provide that if a claimant suffers from a nonexertional impairment as well as an exertional impairment, both are considered in determining his residual functional capacity.  *See* 20 C.F.R. §§ 404.1545, 416.945.

## B.  The ALJ's Decision

The ALJ determined that Plaintiff suffered from the following severe impairments: (1) degenerative disc disease and a herniated disc of the lumbar spine; (2) status post laminectomy surgery; (3) depression/mood disorder; (4) history of alcohol abuse in apparent remission; (5) borderline intellectual functioning; (6) impingement disorder of bilateral shoulders; and (7) sleep apnea. (Tr. 413).  The ALJ further determined, however, that these impairments, whether considered alone or in combination, failed to satisfy the requirements of any impairment identified in the Listing of Impairments detailed in 20 C.F.R., Part 404, Subpart P, Appendix 1.  (Tr. 417).  The ALJ concluded that while Plaintiff was unable to perform his past relevant work, there existed a significant number of jobs which he could perform despite his limitations.   (Tr. 413-18).  Accordingly, the ALJ concluded that Plaintiff was not disabled as defined by the Social Security Act.

### 1.  The ALJ's Decision is Supported by Substantial Evidence

The burden of establishing the right to benefits rests squarely on Plaintiff's shoulders, and he can satisfy his burden by demonstrating that his impairments are so severe that he is unable to perform his previous work, and cannot, considering his age, education, and work experience,

---

be performed (20 C.F.R. 404.1520(f)).

perform any other substantial gainful employment existing in significant numbers in the national economy. *See* 42 U.S.C. § 423(d)(2)(A); *Cohen*, 964 F.2d at 528.

As noted above, the Commissioner has established a five-step disability determination procedure. While the burden of proof shifts to the Commissioner at step five, Plaintiff bears the burden of proof through step four of the procedure, the point at which his residual functioning capacity (RFC) is determined. *See Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (ALJ determines RFC at step four, at which point claimant bears the burden of proof).

With respect to Plaintiff's residual functional capacity, the ALJ determined that Plaintiff is capable of performing work activities, subject to the following limitations: (1) he can lift/carry a maximum of ten pounds and less than 10 pounds frequently; (2) in an 8-hour workday, Plaintiff can stand or walk for up to two hours and sit for at least six hours; (3) he requires a sit/stand option; (4) he can never climb ladders, scaffolds, ropes, ramps, or stairs; (5) he can never kneel; (6) he can only occasionally balance, stoop, crouch, crawl, bend, twist, or turn at the waist; (7) he can only occasionally push or pull with his upper extremities; (8) he cannot perform any overhead reaching activities; (9) he cannot work on uneven surfaces or operate a motor vehicle for longer than 30 minutes at a time; (10) he must use a cane to ambulate; (11) he can perform only simple, unskilled work that requires only minimal contact with co-workers and only brief and superficial contact with the public. (Tr. 415). After reviewing the relevant medical evidence, the Court concludes that the ALJ's determination as to Plaintiff's RFC is supported by substantial evidence.

The ALJ determined that Plaintiff was unable to perform his past relevant work, at which point the burden of proof shifted to the Commissioner to establish by substantial evidence that

a significant number of jobs exist in the national economy which Plaintiff could perform, his limitations notwithstanding. *See Richardson*, 735 F.2d at 964. While the ALJ is not required to question a vocational expert on this issue, "a finding supported by substantial evidence that a claimant has the vocational qualifications to perform <u>specific</u> jobs" is needed to meet the burden. *O'Banner v. Sec'y of Health and Human Services*, 587 F.2d 321, 323 (6th Cir. 1978) (emphasis added). This standard requires more than mere intuition or conjecture by the ALJ that the claimant can perform specific jobs in the national economy. *See Richardson*, 735 F.2d at 964. Accordingly, ALJs routinely question vocational experts in an attempt to determine whether there exist a significant number of jobs which a particular claimant can perform, his limitations notwithstanding. Such was the case here, as the ALJ questioned vocational expert Michelle Ross.

The vocational expert testified that there existed approximately 13,000 jobs in the lower two-thirds of the lower peninsula of the state of Michigan which an individual with Plaintiff's RFC could perform, such limitations notwithstanding. (Tr. 695-98). This represents a significant number of jobs. *See Born v. Sec'y of Health and Human Services*, 923 F.2d 1168, 1174 (6th Cir. 1990); *Hall v. Bowen*, 837 F.2d 272, 274 (6th Cir. 1988).

a. Plaintiff's Supplemental Filing

While resolution of the present claim for Disability Insurance Benefits was pending, Plaintiff filed an application for Supplemental Security Income benefits. (Dkt. #13). Plaintiff's application was denied initially, but on July 21, 2006, ALJ Earl Witten issued a partially favorable decision. ALJ Witten determined that prior to December 1, 2005, Plaintiff retained the ability to perform work consistent with the RFC articulated by ALJ Blatnik in the present case. ALJ Witten

further determined that starting on December 1, 2005, Plaintiff's condition had further deteriorated to the point where he was unable to perform substantial gainful activity on a regular and sustained basis. Accordingly, Plaintiff was awarded benefits starting on December 1, 2005. *Id.*

After filing his initial brief, Plaintiff moved to supplement the present record with a copy of ALJ Witten's decision. (Dkt. #12-13). The Court granted Plaintiff's motion and accepted the material in question for filing. (Dkt. #14). The Court's Order permitting Plaintiff to supplement the record was completely silent on the relevance (if any) such additional evidence possessed in this matter. Defendant requests that the Court reconsider its decision permitting Plaintiff to supplement the record with ALJ Witten's decision. Defendant asserts that this Court is precluded from considering ALJ Witten's decision when evaluating whether ALJ Blatnik's determination is supported by substantial evidence.

As Defendant recognizes in his brief, when appealing an ALJ's denial of benefits, claimants often submit additional evidence that was not before the ALJ. As is well recognized, this Court cannot consider such material. *See Cline v. Commissioner of Social Security*, 96 F.3d 146, 148 (6th Cir. 1996). However, if the claimant can demonstrate that the evidence is new and material, and that good cause existed for not presenting it in the prior proceeding, the Court can remand the case for further proceedings during which this new evidence can be considered. *Id.* at 148. Defendant argues that the evidence in question is not material. The Court agrees.

New evidence, such as ALJ Witten's decision, is material only if there exists a reasonable probability that the Commissioner would have reached a different result if presented with such. *See Sizemore v. Secretary of Health and Human Serv's*, 865 F.2d 709, 711 (6th Cir. 1988). It is unreasonable to conclude that such is the case in the present circumstance, as ALJ Witten agreed

14

with ALJ Blatnik as to Plaintiff's RFC through the date of ALJ Blatnik's decision. ALJ Witten concluded that Plaintiff did not become disabled until more than one year after ALJ's Blatnik's decision. Thus, the Court cannot consider ALJ's Witten's decision and there exists no basis for remanding this matter for consideration of such.

In the past, when a Social Security claimant has sought to submit new evidence, the Court has permitted him to present such and only later determine whether such is material. Because an assessment of materiality usually cannot be made until the Court has thoroughly reviewed the administrative record, the Court has found this approach to be more efficient. Defendant's motion for reconsideration appears to be premised on the conclusion that the Court's Order permitting Plaintiff to supplement the present record with a copy of ALJ Witten's decision also constituted a determination that the Court could, and would, consider such when resolving the present appeal. Because the Court's Order granting Plaintiff's motion to supplement did not specifically address this matter, Defendant's apparent interpretation of such is understandable. In retrospect, the Court should have more clearly indicated the limited scope of its Order. In sum, to the extent that Defendant seeks to preclude the Court from relying on ALJ Witten's decision in resolving Plaintiff's appeal, the undersigned recommends that Defendant's motion for reconsideration be **granted**. To the extent that Defendant requests that the Court strike from the record Plaintiff's supplemental submission, the undersigned recommends that Defendant's motion for reconsideration be **denied**.


b. The ALJ Properly Evaluated the Medical Evidence

Plaintiff argues that the ALJ failed to accord sufficient weight to the opinions expressed by two of his care providers.

15

The treating physician doctrine recognizes that medical professionals who have a long history of caring for a claimant and her maladies generally possess significant insight into her medical condition. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Accordingly, the medical opinions and diagnoses of treating physicians are given substantial deference, and if such opinions and diagnoses are uncontradicted, complete deference is appropriate. *See King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984).

Nonetheless, the ALJ may reject the opinion of a treating physician where such is unsupported by the medical record, merely states a conclusion, or is contradicted by substantial medical evidence. *See Cohen*, 964 F.2d at 528; *Miller v. Sec'y of Health and Human Services*, 1991 WL 229979 at *2 (6th Cir., Nov. 7, 1991) (citing *Shavers v. Sec'y of Health and Human Services*, 839 F.2d 232, 235 n.1 (6th Cir. 1987)); *Cutlip v. Sec'y of Health and Human Services*, 25 F.3d 284, 286-87 (6th Cir. 1994).

When an ALJ chooses to accord less than controlling weight to the opinion of a treating physician, he must adequately articulate his rationale for doing so. *See Wilson v. Commissioner of Social Security*, 378 F.3d 541, 544-47 (6th Cir. 2004). As the *Wilson* court held:

> If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors - namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source - in determining what weight to give the opinion.
>
> Importantly for this case, the regulation also contains a clear procedural requirement: "We will always give good reasons in our notice of determination or decision for the weight we give [the claimant's] treating source's opinion." A Social Security Ruling explains that, pursuant to this provision, a decision denying benefits

"must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

*Id.* at 544 (internal citations omitted).

As the *Wilson* court further held, failure to comply with this requirement is not subject to harmless error analysis. *Id.* at 546-47. As the court expressly stated:

A court cannot excuse the denial of a mandatory procedural protection simply because, as the Commissioner urges, there is sufficient evidence in the record for the ALJ to discount the treating source's opinion and, thus, a different outcome on remand is unlikely. . .To hold otherwise, and to recognize substantial evidence as a defense to non-compliance with § 1527(d)(2), would afford the Commissioner the ability [to] violate the regulation with impunity and render the protections promised therein illusory.

*Id.* at 546 (internal citations omitted).

### 1. Dr. Paarlberg

As discussed above, Plaintiff was examined by Dr. Paarlberg on April 12, 1999. Following this examination, the doctor concluded that Plaintiff could work subject to the following restrictions: (1) no prolonged sitting or standing; (2) he requires a sit-stand option; (3) no repetitive bending; (4) no lifting more than 10 pounds.[2] (Tr. 196). On July 21, 1999, Dr. Paarlberg spoke with an official with the State of Michigan Disability Determination Service concerning his April 12, 1999 examination of Plaintiff. (Tr. 193). The official reported that during this conversation, Dr.

---

[2] In his brief, Plaintiff asserts that Dr. Paarlberg opined that Plaintiff "could only sit for about 15 minutes, stand for about 10 minutes and drive for 30 minutes." (Dkt. #11 at 14-15). This is not accurate. While Plaintiff reported that he experienced such limitations, Dr. Paarlberg did not adopt such. (Tr. 195-96). The Court further notes that such limitations are contradicted by Plaintiff's testimony at the administrative hearing, as well as the objective medical evidence of record.

Paarlberg reported that he "does not feel [Plaintiff] will be able to work any type of job full-time." (Tr. 193). Plaintiff asserts that because Dr. Paarlberg was his treating physician, the ALJ was obligated to accord controlling weight to his opinion.

First, as Defendant correctly asserts, Dr. Paarlberg does not qualify as a treating physician. The doctor examined Plaintiff on September 23, 1998, and again on April 12, 1999, at the request of the Michigan Disability Determination Service. (Tr. 182-83, 195-96). Because Dr. Paarlberg examined Plaintiff on only two occasions he does not qualify as a treating physician whose opinion is entitled to special deference. *See Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994); *Daniels v. Commissioner of Social Security*, 152 Fed. Appx. 485, 490-91 (6th Cir., Oct. 24, 2005).

Furthermore, substantial evidence supports the ALJ's evaluation of Dr. Paarlberg's opinion. The opinions expressed by Dr. Paarlberg immediately after his April 12, 1999 examination of Plaintiff are entirely consistent with the ALJ's RFC determination. As for the doctor's subsequent July 21, 1999 statement that he "does not feel [Plaintiff] will be able to work any type of job full-time," such is entitled to little weight for several reasons. It is contradicted by the results of the doctor's own examination of Plaintiff, as well as the opinion he expressed immediately thereafter. Moreover, while the doctor indicated that he did not believe that Plaintiff could perform any type of work, he also recommended that Plaintiff participate in a functional capacity evaluation "to come up with the specifics on what he can and cannot do." (Tr. 193). Thus, Dr. Paarlberg's statement, rather than articulating the functional limitations from which Plaintiff suffers, is instead simply an opinion that Plaintiff is disabled. However, the determination that a claimant is disabled is a legal determination reserved to the Commissioner. *See* 20 C.F.R. § 404.1527. In sum, the ALJ's

determination to afford less than controlling weight to Dr. Paarlberg's opinion is supported by substantial evidence.

### 2. Dr. Daoud

On February 24, 2004, Dr. Daoud completed a questionnaire concerning Plaintiff's residual functional capacity. (Tr. 615-19). The doctor reported that Plaintiff was "incapable of [performing] even low stress jobs" because of his depression. (Tr. 617). The doctor reported that during an 8-hour day, Plaintiff can sit for less than two hours and stand/walk for less than two hours. (Tr. 617). The doctor reported that Plaintiff can lift less than 10 pounds and requires a sit/stand option. (Tr. 618). Plaintiff asserts that because Dr. Daoud was his treating physician, the ALJ was obligated to accord controlling weight to her opinion.

The ALJ accorded little weight to this particular opinion. (Tr. 414-15). As the ALJ correctly noted, the opinions expressed in this questionnaire are inconsistent with Dr. Daoud's treatment notes. For example, on May 1, 2003, Dr. Daoud reported that Plaintiff's back pain had improved and that he was sleeping better. (Tr. 507). On June 3, 2003, Dr. Daoud reported that Plaintiff was experiencing "mild to moderate" back pain. (Tr. 511). An examination of Plaintiff's back revealed tenderness, but no spasm or muscle weakness. (Tr. 511). On July 7, 2003, Dr. Daoud reported that Plaintiff's back pain rated 5/10 and that his medications were helping, without any side effects. (Tr. 512). Dr. Daoud instructed Plaintiff to exercise. (Tr. 512). On October 9, 2003, Dr. Daoud reported that Plaintiff was ambulating without his cane. (Tr. 513). The doctor again instructed Plaintiff to exercise. (Tr. 513). These observations are inconsistent with the doctor's opinion that Plaintiff experienced work-preclusive limitations. As for Dr. Daoud's opinion that

Plaintiff's depression was work-preclusive, the ALJ correctly observed that such "is not borne out by the doctor's own reports, which contain no detailed mental evaluation." (Tr. 414-15). As the ALJ further observed, "[m]ore importantly, psychiatric specialists to whom [Dr. Daoud] referred the claimant found that he was not so limited." (Tr. 415). Accordingly, substantial evidence supports the ALJ's determination to afford less than controlling weight to Dr. Daoud's opinion.

### b. The ALJ Properly Evaluated Plaintiff's Credibility

The ALJ found that Plaintiff's "testimony with respect to the extent and severity of his impairments and resulting functional limitations is not fully credible." (Tr. 412-13). Plaintiff asserts that the ALJ failed to give proper weight to his subjective allegations.

As the Sixth Circuit has long recognized, "pain alone, if the result of a medical impairment, *may* be severe enough to constitute disability." *King v. Heckler*, 742 F.2d 968, 974 (6th Cir. 1984) (emphasis added). As the relevant Social Security regulations make clear, however, a claimant's "statements about [her] pain or other symptoms will not alone establish that [she is] disabled." 20 C.F.R. § 404.1529(a); *see also*, *Walters v. Commissioner of Social Security*, 127 F.3d 525, 531 (6th Cir. 1997) (quoting 20 C.F.R. § 404.1529(a)). Instead, as the Sixth Circuit has established, a claimant's assertions of disabling pain and limitation are evaluated pursuant to the following standard:

> First, we examine whether there is objective medical evidence of an underlying medical condition. If there is, we then examine: (1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain.

*Walters*, 127 F.3d at 531.  This standard is often referred to as the *Duncan* standard.  *See Workman v. Commissioner of Social Security*, 2004 WL 1745782 at *6 (6th Cir., July 29, 2004).

Accordingly, as the Sixth Circuit has repeatedly held, "subjective complaints may support a finding of disability only where objective medical evidence confirms the severity of the alleged symptoms."  *Id.* (citing *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989)).  However, where the objective medical evidence fails to confirm the severity of a claimant's subjective allegations, the ALJ "has the power and discretion to weigh all of the evidence and to resolve the significant conflicts in the administrative record."  *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531).

In this respect, it is recognized that the ALJ's credibility assessment "must be accorded great weight and deference."  *Workman*, 2004 WL 1745782 at *6 (citing *Walters*, 127 F.3d at 531); *see also*, *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001) ("[i]t is for the [Commissioner] and his examiner, as the fact-finders, to pass upon the credibility of the witnesses and weigh and evaluate their testimony").  It is not for this Court to reevaluate such evidence anew, and so long as the ALJ's determination is supported by substantial evidence, it must stand.  The ALJ found Plaintiff's subjective allegations not to be fully credible, a finding that should not be lightly disregarded.  *See Varley v. Sec'y of Health and Human Services*, 820 F.2d 777, 780 (6th Cir. 1987).

As the ALJ correctly concluded, to the extent that Plaintiff alleges that he is limited to an extent beyond that recognized by the ALJ's RFC determination, such is contradicted by the objective medical evidence, and Plaintiff's reported activities.  The Court finds, therefore, that there exists substantial evidence to support the ALJ's credibility determination.

c.   The ALJ Properly Relied on the Vocational Expert's Testimony

Plaintiff asserts that the ALJ relied upon the response to an inaccurate hypothetical question.  While the ALJ may satisfy his burden through the use of hypothetical questions posed to a vocational expert, such hypothetical questions must accurately portray the claimant's physical and mental impairments.  *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 150 (6th Cir. 1996).

The hypothetical question which the ALJ posed to the vocational expert simply asked whether there existed jobs which an individual could perform consistent with Plaintiff's limitations, to which the vocational expert indicated that there existed approximately 13,000 such jobs.  Because there was nothing improper or incomplete about the hypothetical questions he posed to the vocational expert, the ALJ properly relied upon her response thereto.

## **CONCLUSION**

For the reasons articulated herein, the undersigned concludes that the ALJ's decision adheres to the proper legal standards and is supported by substantial evidence.  Accordingly, the undersigned recommends that the Commissioner's decision be **affirmed**. The undersigned further recommends that Defendant's Motion to Reconsider  (Dkt. #17) be **granted in part and denied in part**.

OBJECTIONS to this report and recommendation must be filed with the Clerk of Court within ten (10) days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure

to file objections within the specified time waives the right to appeal the District Court's order. *See* *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

Date:  July 30, 2009

_/s/ Ellen S. Carmody_____
ELLEN S. CARMODY
United States Magistrate Judge